*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

GREGORY LYNN NIEMAN,

        Defendant-Appellant.

UNPUBLISHED
April 18, 2019

No. 339517
Macomb Circuit Court
LC No. 2016-000396-FC

Before: JANSEN, P.J., and METER and GLEICHER, JJ.

PER CURIAM.

A jury convicted defendant of first-degree premeditated murder and first-degree felony murder for the strangulation death of his elderly father. The court sentenced defendant to life imprisonment without parole for each conviction. Defendant contends that his convictions and sentences violate his right to be free of double jeopardy, and we agree. We remand for entry of a judgment of sentence with a single first-degree murder conviction supported by two different theories.

Defendant additionally asserts that the trial court violated his rights by denying his request for new appointed counsel and "forcing" him to represent himself on the final two days of trial. Defendant is not entitled to relief on these grounds as he was given more than adequate warning that self-representation was the consequence he would face if he refused to work with his fourth lawyer. Although defendant accurately portrays certain statements made by the prosecutor as flagrant misconduct, the comments did not deny defendant a fair trial. And contrary to defendant's assertion, the prosecutor presented sufficient evidence to support his murder conviction. Accordingly, we affirm defendant's conviction of first-degree murder, but remand for correction of the judgment of sentence.

## I. BACKGROUND

Defendant's convictions arise from the death of his 88-year-old father, Donald Nieman. Defendant had served as Donald's resident caregiver, guardian, and conservator for approximately 1½ years at the time of Donald's death. During that time, neighbors heard defendant yell at and insult Donald and heard and observed evidence of physical abuse. Donald

claimed he found his father dead in his bedroom on the morning of December 27, 2015. Evidence suggested that Donald had passed much earlier. Following an autopsy, the medical examiner concluded that Donald died from manual strangulation.

## II. RIGHT TO COUNSEL

### A. BACKGROUND

The court appointed Steven Kaplan to represent defendant on January 4, 2016. At a June 13 pretrial hearing, Kaplan's law partner appeared and indicated that Kaplan and defendant "have apparently had a breakdown in the attorney/client relationship" and defendant "informed [Kaplan] that he does not wish to have him continue to represent him." The pair had "serious disagreements in terms of the course of how [defendant] would like the case to go." Defendant added that Kaplan had only visited him once and had "put[] no effort in." The court agreed to appoint replacement counsel for defendant, but warned, "[Y]ou're going to be stuck with who ever you get this time."

The court appointed defendant's second attorney, Michael J. Dennis, on June 17, 2016. At a pretrial hearing on November 7, defendant complained that Dennis had secured no discovery from the prosecution. Dennis conceded that there had been difficulties in getting discovery. Dennis was at that time looking for an expert to review the autopsy report. Dennis noted that defendant's treatment of him had been untenable:

> I went and met with [defendant] in the jail and it turned into a shouting match, him telling me what I had to do on the case. I tried to explain to him very thoroughly what needed to be done, but he was adamant that - - and I said to him, I said, you want to represent yourself, go ahead.

The court admonished defendant that he "should be thanking [his] lucky stars that [he] ha[d] Mr. Dennis" and Kaplan to represent him and stated, "I don't know what you're expecting."

Defendant expressed his belief that Donald's body should be exhumed and reexamined by an independent medical examiner, "like U of M or something." Defendant maintained his innocence and asserted, "[H]e's a polished attorney. I was not arguing. He was arguing with me. I just asked him don't waste the court's money, exhume, and we'll get right to the point and prove my innocence." Defendant further complained that Macomb County was "like the old boys club" and suggested that the detectives and medical examiner were working against him. The court advised defendant that he would not order Donald's body exhumed unless, like Dennis indicated, an independent expert reviewed the autopsy report and recommended that action.

When his arguments did not persuade the court to order the body exhumed, defendant returned to his complaints about his counsel, contending that Dennis was "not even trying" and was working on two other cases at the same time. Dennis informed the court that defendant had accused him too of being "part of the old boys club from Macomb." The court warned defendant that as he was being tried and could be convicted in Macomb, he would get a court-appointed attorney who practices in Macomb, "unless you want to hire your own." Moreover, defendant would not be appointed an attorney who only worked on his case alone. "[Y]ou don't just get to

go through the whole list until you find someone who you think you like," the court warned, "That's just not how it works. If you want to hire your own, I will give you leave to do so."

The court adjourned the hearing for two weeks to allow the prosecutor to remedy the discovery deficiency and advised defendant that he could renew his motion for substitute counsel at that time. Defendant then requested that the court appoint Michelene Eberhard to represent him because "[s]he's supposed to be a really good attorney." The court informed defendant that if he wanted to select his own attorney, he had to pay for his own attorney. Otherwise, defendant had to abide by the rotation of appointed attorneys in Macomb County.

On November 21, Dennis indicated that he had received the remainder of the discovery from the prosecutor and scheduled a meeting for the following day with an independent examiner. Despite this progress, defendant stated, "I am firing him." Defendant indicated that he had met with Eberhard and wanted the court to appoint her to represent him, but the court reminded defendant that he could not just select his preferred attorney from the appointed counsel list. If defendant insisted on replacement counsel, the court warned, "you're getting who you get and I'm done. You've got to figure out how to hire your own if you want to pick your own." The court further noted, "You're going to take who ever is next on the list. And, this is your third one. So, you get no more."

The next day, the court appointed R. Timothy Kohler to represent defendant. Unfortunately, Kohler had a conflict; he represented another client who allegedly heard defendant's jailhouse confession. Accordingly, the court appointed defendant a fourth attorney—Joseph R. Kosmala—on December 16, 2016.

At a March 2017 hearing, Kosmala noted that he had filed a motion to exhume Donald's body, which the court denied. Kosmala was in the process of hiring an independent medical examiner to review the autopsy, but defendant had struck many names from the list of potential pathologists. Kosmala had attempted to secure someone connected with the University of Michigan, "which is a big sticking point for [defendant]," but had been advised that the university's pathologists cannot provide private consults. Another independent pathologist, Werner Spitz, potentially had a conflict in the matter and defendant viewed Spitz as part of the Macomb government. Ultimately, Kosmala noted, "I'm running out of pathologists." Despite the extensive work Kosmala had done, he and defendant "had a very unsuccessful consult" the night before the hearing—"He is absolutely insistent, insistent, despite all my explanations over and over again, on getting somebody from University of Michigan."

Defendant informed the court, "He lies, first of all. I don't want him as my attorney." The court interjected, "You've said this about every single attorney. I'm not going there." But defendant persisted. During a lengthy exchange, the court repeatedly reminded defendant that if he wanted counsel of his choosing, he would have to retain his own attorney. Because defendant would not drop the subject and continued interrupting, the court removed defendant from the courtroom and scheduled the next hearing.

The court held another pretrial hearing in April 2017. In the meantime, Kosmala had secured an independent autopsy review by a pathologist with "a passing affiliation with the

University of Michigan, which was a concern that the defendant had." That doctor was still conducting his review.

Defendant addressed the court, accusing Kosmala of "talk[ing] more like a prosecutor." Defendant challenged the court's and Kosmala's earlier statements that his siblings opposed exhuming Donald's body. Defendant asserted that he spoke to his sister and she denied that claim. In relation to an earlier revelation that Donald's body had not been embalmed and therefore exhumation would be pointless, defendant complained that he had ordered the body embalmed as Donald's guardian and conservator. Defendant was angry that someone with no "right to do that" had cancelled the embalming service. The court reminded defendant that "the relevant portions" of Donald's body had been removed and preserved and therefore could still be independently examined. However, defendant was sure that there was "lying here, corruption, falsifying documents, making statements that are not true." Defendant insisted that "red flags are going everywhere" and his "case needs to be looked into." Defendant again asserted, "I don't want this man as my attorney." And the court again informed defendant that no new attorney would be appointed; "For the 90th time, it's duly noted."

Trial was scheduled to begin on May 17, 2017. The first 70 pages of the transcript are dedicated to defendant airing the same grievances against Kosmala *ad nauseum*. The court patiently listened and tried to explain to defendant that his choice was either to proceed with Kosmala as his attorney, represent himself, or retain counsel to appear the next day. In any event, the court advised, trial would proceed that day. Defendant refused to change out of his jail uniform and into a court-provided suit, contending that his siblings promised to bring him his own clothes. His siblings had not appeared, however. Defendant further insisted that trial be delayed because, he claimed, Kosmala had failed to secure specific witnesses who would allegedly testify that Donald fell a lot and sometimes "on purpose," and that Donald's medications made him prone to bruising and made his bones brittle. The prosecutor tried to help by noting that the state's case would take a week to present and defendant could contact his proffered witnesses in the meantime. Defendant was angry that the independent medical examiner who reviewed the autopsy found nothing amiss and would not recommend exhuming Donald's body. Defendant also continued to accuse the state actors of corruption and claimed the FBI should look into his case.

When the interaction became too heated and defendant repetitively interrupted the proceedings, the bailiff removed him from the courtroom. The court advised defendant to use this break to think about how he wanted to proceed to trial. When defendant returned 15 minutes later, he indicated that his family would retain an attorney for him. He also had not changed out of his jail uniform. The court noted that defendant could hire his own attorney at any time during the trial. In the meantime, however, defendant would be required to either proceed with Kosmala or represent himself with Kosmala as stand-by counsel. Defendant lamented that he did not want Kosmala to represent him, but that he was "not qualified to represent [him]self."

Ultimately, defendant admitted that he could not control himself in front of the jury and he was removed from the courtroom during jury selection. Kosmala continued to represent defendant as all agreed defendant had not made a knowing and voluntary waiver of his right to appointed counsel. The court arranged for a video feed in the holding cell but defendant refused

-4-

to even watch the proceedings. And before voir dire, Kosmala advised the venire that defendant had a right to choose to be present and that he elected not to come into the courtroom.

After an hour of voir dire and an hour lunchbreak, the court brought defendant back into the courtroom. Defendant again stated his intent to retain his own attorney. Although defendant did not want Kosmala to select his jury as "[t]his whole thing smells of corruption," he also did not want to be present in the courtroom. Defendant was again removed, the jury venire returned, and voir dire continued. By the end of the day, a jury had been empaneled.

On the second day of trial, which was a Thursday, Kosmala reported that Robert Kirk, the attorney handling Donald's probate case, contacted each of defendant's siblings, who indicated that they would not assist in securing private counsel for defendant. The siblings had given Kirk a garbage bag filled with defendant's clothes that needed to be cleaned before they could be worn in court. The dry cleaner could not complete the job until that weekend. Defendant challenged this description, claiming that his sister told him the night before that she was trying to retain new counsel for him. He refused to wear court-provided clothing until his own clothes were ready. And defendant continued his complaints about Kosmala's performance and the corruptness of Macomb County government.

Defendant again stated that Kosmala was "fired" and asked the court to appoint substitute counsel. The court reminded defendant, "We've gone through this." She offered defendant three options: represent himself with Kosmala as advisory counsel, allow Kosmala to handle the defense, or hire his own attorney. Defendant descended into disruptive behavior, ranting and "roaming around the courtroom." He refused to stay in the courtroom for trial, and refused to watch the trial via closed-circuit television. After 20 pages of transcript filled with this behavior, the bailiff escorted defendant out of the courtroom. Before the jury was brought in, the court noted that defendant was "being relatively loud" and could be heard in the courtroom. Accordingly, defendant was removed to a lower floor in the building.

On Friday, March 19, the third day of trial, defendant complained about attorney Kirk and reiterated that he would only stay in the courtroom if he could wear his own clothes. He reiterated his complaints about Kosmala as well. After 19 pages of transcript, defendant was removed from the courtroom again. The trial continued and the prosecutor closed the state's case-in-chief.

On the fourth day of trial, defendant appeared in the courtroom in his own clothes. He indicated his intent to testify and said he understood that he would have to follow the question and answer format. Before the jury was brought in, defendant complained that he had fired Kosmala but that the court "hired him back." Defendant also returned to his complaints that he was denied the right to be present in the courtroom because he would not wear court-provided clothing. He returned to themes of corruption and fraud. He accused Kosmala of failing to contact the witnesses he suggested. Kosmala responded that he would not call the witnesses to the stand because their testimony would be irrelevant and because it would be against his "ethical obligation to this court" and his "professional responsibility" as the defenses would "be improper." Defendant exploded into a rage and ultimately declared that he would represent himself so he could call and question his witnesses. The court advised that it would allow defendant to call his siblings who were in the courthouse, but not the other witnesses who were

never identified with specificity (a female teller at Donald's bank and an employee of his local Walgreen's pharmacy).

After more complaints from defendant, the court stated, "I'll allow him to call Randy Nieman and rebuttal witnesses. Have a seat. Mr. Kosmala, you are now advisory counsel." The court warned defendant, "[Y]ou need to not be disruptive and follow the Court Rules." The prosecutor was concerned that the record was inadequate and asked defendant a short series of questions regarding his education and understanding of the legal process. Defendant was again advised that even representing himself, his right to present witnesses would be limited to the list approved by the court. Although he continued to express his displeasure, defendant stated, "Yes I'm going to represent myself."

Defendant called his brothers Randy, Tom, and Donald, Jr. to the stand. He called his brother-in-law, Michael Wilson, and family friend, Pamela Terry. Defendant wished to call his father's friend, Alvin Kukuk to testify, but Kukuk recently had passed away. Defendant then took the stand in his own defense. There were several long-winded arguments after defendant violated the court rules or the rules of evidence and multiple breaks for the jury so defendant could be admonished. The court then ordered defendant to provide an outline of the remainder of his narrative testimony. Defendant refused and the court ruled that defendant would not be permitted to testify further.

On the fifth and final day of the jury trial, defendant stated his intent to continue representing himself. The court allowed defendant 20 minutes with Kosmala to prepare his closing argument. During his statement, defendant engaged in an argument with the prosecutor and asserted that he was uninformed about the facts elicited during the case-in-chief because he did not want to come into the courtroom "looking like a hobo." The court reminded defendant on several occasions that the closing argument was not an additional opportunity to testify and that he had to stick to the facts brought out at trial. The court allowed defendant to speak for nearly an hour and then excused the jury from the courtroom. The court admonished defendant for improper behavior during his argument and defendant again launched into a diatribe about corruption in Macomb County. Defendant remained agitated and the court feared he would improperly interrupt the prosecutor's rebuttal argument. Accordingly, the court had defendant removed from the courtroom. After a 10-minute break, defendant promised to remain quiet and was allowed to return.

During jury instructions, defendant again interrupted the court and tried to "correct" issues of fact. The court dismissed the jury and repeatedly ordered defendant to "stop talking." The court removed defendant again before the alternative jurors were selected and dismissed from deliberation.

## B. LEGAL PRINCIPLES

Defendant contends that the trial court violated his Sixth Amendment right to counsel before and during trial by forcing him to proceed with Kosmala and denying his requests for substitute counsel. He further asserts that he did not voluntarily, knowingly, and unequivocally waive his right to counsel and was pushed into representing himself.

A criminal defendant who faces incarceration has a constitutional right to counsel at all critical stages of the criminal process. *People v Williams*, 470 Mich 634, 640-641; 683 NW2d 597 (2004). A defendant may request substitute appointed counsel, but is not entitled to the appointment of counsel of his choosing. *People v Traylor*, 245 Mich App 460, 462; 628 NW2d 120 (2001). Moreover, substitution "is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process." *Id*. Generalized dissatisfaction with counsel's performance is insufficient to warrant the substitution of counsel. *People v McFall*, 309 Mich App 377, 383; 873 NW2d 112 (2015). Rather, a defendant must show "a legitimate difference of opinion . . . as to a fundamental trial tactic," "a destruction of communication and a breakdown in the attorney-client relationship," or "a lack of diligence or interest" on the attorney's part. *Id*. (cleaned up).[1]

Upon a criminal defendant's request to proceed pro se, the trial court must determine whether the request is unequivocal, whether the defendant is knowingly, intelligently, and voluntarily waiving the right to legal counsel, and whether the defendant's self-representation will disrupt, unduly inconvenience, or otherwise burden the court and the administration of justice. *People v Anderson*, 398 Mich 361, 367-368; 247 NW2d 857 (1976). In addition, the trial court must comply with MCR 6.005(D), which provides:

> The court may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first
>
> (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation.
>
> (2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

"[I]f the trial court fails to substantially comply with the requirements in *Anderson* and the court rule, then defendant has not effectively waived his Sixth Amendment right to the assistance of counsel." *People v Russell*, 471 Mich 182, 191-192; 684 NW2d 745 (2004). "Substantial compliance requires that the court discuss the substance of both *Anderson* and MCR 6.005(D) in a short colloquy with the defendant, and make an express finding that the defendant fully understands, recognizes, and agrees to abide by the waiver of counsel procedures." *Russell*, 471 Mich at 191 (cleaned up). "Proper compliance with the waiver of counsel procedures is a necessary antecedent to a judicial grant of the right to proceed in propria persona. Proper compliance requires that the court engage, on the record, in a methodical assessment of the wisdom of self-representation by the defendant." *People v Hicks*, 259 Mich App 518, 523; 675 NW2d 599 (2003) (cleaned up).

---

[1] This opinion uses the new parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, Cleaning Up Quotations, 18 J App Pract & Process 143 (2017).

## B. SUBSTITUTION OF COUNSEL

The trial court did not violate defendant's rights by denying his requests for a fifth appointed attorney. Defendant did not establish good cause for yet another substitution of counsel. Defendant tried to game the trial system. Right from the beginning, defendant made his attorneys' jobs an uphill battle. He focused on irrelevant details, such as whether the funeral home honored his order to embalm Donald's body and insisted that his independent medical examiner be connected with the University of Michigan. He refused to move past these issues and cooperate with his first two attorneys to focus on the real issues in this case. Even on the eve of trial, defendant fought with Kosmala, insisting on a defense that defendant's own experts rejected—that Donald's injuries could have been caused by a fall rather than forceful, manual strangulation. Accordingly, defendant refused to accept Kosmala's explanation for not seeking out his proffered lay witnesses to support his suggested theory. In the end, Kosmala's decision regarding which witnesses to call fell within the "categories of professional judgment and trial strategy that are matters entrusted to the attorney." *Traylor*, 245 Mich App at 463. The dispute over witnesses did not amount to good cause warranting substitution of counsel.

Defendant also tried to convince the court that Kosmala had done nothing to prepare for trial. However, Kosmala filed an ex parte petition for extraordinary attorney fees that more than adequately refutes this claim. The petition outlines Kosmala's various efforts to investigate and prepare for the case, including reviewing extensive discovery, visiting defendant five times in jail, seeking out two independent medical examiners who satisfied defendant's specific request to be associated with the University of Michigan and working with them to review the autopsy, and contacting Kirk to secure possible witnesses and defendant's clothing, as well as to learn about the relevant probate history. Defendant's allegation that Kosmala failed to investigate and prepare is not supported by the record and did not amount to good cause warranting substitution of counsel.

Defendant further cites as good cause to substitute counsel a breakdown in the attorney-client relationship. Contrary to defendant's repeated assertions, however, there is no record indication that Kosmala ever lied to defendant or ignored him. Rather, defendant's constant complaints about all his attorneys reflected that he could not, or would not, maintain a working relationship with any attorney. Defendant could not avoid trial indefinitely with such antics. See *People v Buie*, 298 Mich App 50, 64; 825 NW2d 361 (2012) (cleaned up) ("[A] defendant may not request substitute counsel if the defendant purposely breaks down the attorney-client relationship by refusing to cooperate with his assigned attorney.").

## C. SELF-REPRESENTATION

Defendant requested to represent himself, but not until the fourth day of trial after the court told him repeatedly that it would not appoint substitute counsel. The court warned defendant that if he terminated the services of his fourth lawyer, he would be required to represent himself. The court did not strictly follow procedure before permitting defendant to take over his own defense. Neither the court nor the prosecutor advised defendant of the charges against him or of the sentencing consequences he faced. We note, however, that defendant was well aware of the charges and that he faced a life sentence. He repeatedly stated throughout the proceedings that he was "fighting for his life." The court complied with MCR 6.005(D)(2) by

requiring defendant to accept Kosmala as stand-by counsel. Although the trial court did not make a specific finding whether defendant's self-representation would disrupt or burden the proceedings, the court warned defendant outside the presence of the jury that his disruptive behavior would result in his removal from the courtroom and reinstatement of Kosmala's representation.

The most concerning deficiency in this record is the trial court's failure to expressly and specifically find that defendant unequivocally, knowingly, intelligently, and voluntarily waived his right to counsel. That deficiency does not warrant a new trial, however, as defendant otherwise waived or forfeited his right to counsel.

In *People v Kammeraad*, 307 Mich App 98, 130; 858 NW2d 490 (2014) (cleaned up), this Court noted, "the right to assistance of counsel, cherished and fundamental though it may be, may not be put to service as a means of delaying or trifling with the court." *Kammeraad* recognized that a criminal defendant can either waive or forfeit his right to counsel. *Id*. A defendant may forfeit his right to counsel through "purposeful tactics and conduct that were employed to delay and frustrate the orderly process of the lower court's proceedings." *Id*. at 131, citing *State v Mee*, 756 SE2d 103, 114 (NC App, 2014). Stated differently, "willful conduct by a defendant that results in the absence of defense counsel constitutes a forfeiture of the right to counsel." *Kammeraad*, 307 Mich App at 131. Forfeiture is distinguishable from waiver. When a defendant forfeits the right to counsel, the court is not required to determine whether the defendant knowingly, understandingly, and voluntarily gave up his right. *Id*.

In *Kammeraad*, 307 Mich App at 131-132, the defendant forfeited his right to counsel by "refus[ing] to accept, recognize, or communicate with appointed counsel, . . . refus[ing] . . . self-representation, and . . . refus[ing] to otherwise participate in the proceedings." In fact, the defendant refused to get dressed and walk into the courtroom, requiring court officers to place him in a wheelchair, cover him up, and haul him in. *Id*. at 112. A forfeiture can be found on less outlandish conduct, however. A defendant might forfeit his right to counsel by refusing to accept appointed counsel while also failing " 'to retain counsel within a reasonable time,' " or by acting " 'abusive toward' " his retained or appointed counsel. *Id*. at 132, quoting *United States v McLeod*, 53 F3d 322, 325 (CA 11, 1995).

This Court also recognized "the hybrid situation of 'waiver by conduct,' " also known as " 'forfeiture with knowledge,' " "which combines elements of forfeiture and waiver." *Kammeraad*, 307 Mich App at 133-134, quoting *United States v Goldberg*, 67 F3d 1092, 1101 (CA 3, 1995). Waiver by conduct/forfeiture with knowledge occurs when "a defendant is warned that he or she will lose counsel if the defendant engages in dilatory tactics, with any misconduct thereafter being treated as an implied request for self-representation." *Kammeraad*, 307 Mich App at 133.

It would have been better practice for the trial court to advise defendant of the charge against him, the sentencing consequences he faced, and the various risks of representing himself before allowing defendant to represent himself. However, as noted, defendant was trying to game the trial system by making his attorneys' work impossible. He accused his attorneys of lying, fraud, corruption, collusion with the prosecutor's office, and laziness. For the first three days of his trial, defendant refused to appear in the courtroom or to watch a live video feed of the

proceedings. At one point, defendant had to be moved to a distant holding cell so his angry outbursts would not be heard by the jury. Defendant had more than a year and a half to hire his own attorney and never did so. Despite his repeated objections that his siblings were hiring counsel for him and the trial should be postponed, defendant's brothers specifically told Kirk that they would not assist defendant in this regard and defendant's sister refused to return Kirk's calls. Ultimately, after several admonishments that defendant should proceed with learned counsel, defendant expressly stated that he desired to represent himself. He cannot now claim error and demand a new trial.

## III. PROSECUTORIAL MISCONDUCT

Next, defendant claims that he was denied a fair trial because of two statements made by the prosecutor in objections to defendant's cross-examination of the defense witnesses and during defendant's testimony on the stand. Defendant objected to both statements.

We review preserved claims of prosecutorial misconduct de novo, on a case-by-case basis, examining the challenged remarks in context to determine whether the defendant received a fair and impartial trial. *People v Thomas*, 260 Mich App 450, 453; 678 NW2d 631 (2004); *People v Rodriguez*, 251 Mich App 10, 29-30; 650 NW2d 96 (2002). "Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664, 680 (2008). Prosecutors are given latitude with regard to their arguments. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). "They are free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Id.* A prosecutor may use "hard language" or "[e]motional language" if the language does not interfere with the defendant's right to a fair trial and is supported by the evidence. *People v Ullah*, 216 Mich App 669, 678-679; 550 NW2d 568 (1996). "Nevertheless prosecutors should not . . . express their personal opinion of a defendant's guilt, and must refrain from denigrating a defendant with intemperate and prejudicial remarks." *Bahoda*, 448 Mich at 282-283 (cleaned up).

Before the jury was brought into the courtroom on the fourth day of trial, the court notified defendant that it was irrelevant whether he asked the funeral home to embalm Donald's body and whether the funeral home complied with that directive. Defendant subsequently presented his brother Randy as a defense witness. Despite the court's warning, defendant asked Randy a series of questions about their visit to the funeral home and inquired whether Randy heard defendant order the embalming. The prosecutor objected on relevance grounds and the sustained the objection. Defendant persisted in this questioning even so, invoking further objection. Defendant returned to this line of questioning when he called his brother Thomas to the stand. The prosecutor objected, stating, "Despite my continued objection, sustaining it, none of this line of questioning is relevant to how his father was buried after the Defendant murdered his father by manual strangulation."

This statement was plainly inappropriate and was flagrant misconduct on the prosecutor's part. The prosecutor expressly stated that defendant was guilty of murder. The impropriety was not outcome determinative, however. Defendant immediately objected and the court sustained, stating, "I will sustain your objection to the argumentative nature of the language within your

objection. Please keep it to the legal objections." "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements[.]" *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Given the immediate resolution of this issue and the strength of the evidence against defendant, the prosecutor's misconduct in this regard was ultimately harmless.

During defendant's narrative-style redirect testimony, defendant wanted to testify that he had saved the life of a fellow inmate and that this reflected his good character. The prosecutor objected, and the court sustained, that this testimony would go beyond the scope of redirect and therefore was inadmissible. Defendant continued to argue for the evidence's admission as he was "speaking the truth." The prosecutor interjected, "Saving a life after you have taken one doesn't make one equal." Defendant again immediately objected. The court did not admonish the prosecutor or provide a curative instruction. Instead, the court directed defendant (not the prosecutor), "Again, the rules of evidence. We are following the rules of evidence."

The prosecutor's comment was completely inappropriate and the trial court's response was insufficient. However, the impropriety was brief; a mere drop in the bucket compared to the overwhelming evidence against defendant. And the court directed the jurors at the end of the proceedings that defendant was presumed innocent and the attorneys' arguments were not evidence. On this record, defendant cannot establish the prejudice necessary to merit a new trial.

## IV. DOUBLE JEOPARDY

Defendant correctly posits, and the prosecution concedes, that defendant's right against double jeopardy was violated because he was convicted of two counts of murder for the death of just one victim.

The Double Jeopardy Clause protects against multiple punishments for the same offense, US Const, Am V; Const 1963, art 1, § 15. *People v Matuszak*, 263 Mich App 42, 49; 687 NW2d 342 (2004). As explained in *People v Orlewicz*, 293 Mich App 96, 112; 809 NW2d 194 (2011):

> [C]onvicting a defendant of both first-degree premeditated murder and first-degree felony murder arising out of the death of a single victim is a violation of double-jeopardy protection. We will uphold a single conviction for murder based on two alternative theories. Accordingly, the proper remedy when a defendant is convicted of both first-degree premeditated murder and first-degree felony murder arising out of the death of a single victim is to modify the conviction to specify that it is for a single count of first-degree murder supported by two theories. [Cleaned up.]

Based on this precedent, we must remand to the trial court for entry of an amended judgment of sentence reflecting a single first-degree murder conviction based on two theories, as well as a single life sentence.

## V. SUFFICIENCY OF THE EVIDENCE

Finally, defendant challenges the sufficiency of the evidence supporting his convictions. Specifically, defendant complains that there is no physical evidence linking defendant to the

crime or to any prior abuse of his father. However, physical evidence is not required to prove a crime.

We review de novo a challenge to the sufficiency of the evidence, taking the evidence in the light most favorable to the prosecution to determine whether the trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018). "All conflicts with regard to the evidence must be resolved in favor of the prosecution." *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).

"The elements of first-degree premeditated murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). Premeditation means "to think about beforehand," and deliberation means "to measure and evaluate the major facets of a choice or problem." *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (cleaned up). "The interval between the initial thought and ultimate action should be long enough to afford a reasonable person time to take a second look." *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003) (cleaned up). Premeditation and deliberation "may be inferred from the circumstances surrounding the killing." *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995). It "may be established through evidence of (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide." *Unger*, 278 Mich App at 229. "Manual strangulation can be used as evidence that a defendant had an opportunity to take a second look." *Gonzalez*, 468 Mich at 641 (cleaned up).

Even defendant's independent experts agreed that Donald's autopsy was properly conducted and revealed that his cause of death was manual strangulation. According to the medical examiner, manual strangulation would normally require continuous pressure on the neck for three to five minutes. The examination revealed that Donald struggled and clawed at his neck to try to free his windpipe. Strangulation alone was sufficient to support that the murder was committed with premeditation and deliberation. Defendant was the only person in the house with Donald before his death; there was no evidence of a break-in or a visitor. In the days following Donald's death, defendant's right hand was extremely swollen, there was an indentation on his palm, and there was a scratch on his forearm. The evidence was therefore sufficient to support that defendant was the individual who strangled Donald.

Moreover, several witnesses testified that Donald and defendant had a volatile relationship. Donald's neighbors often heard defendant yelling at and insulting Donald. Some neighbors reported that defendant threatened Donald's life; another heard slapping noises and Donald moaning. The yelling only stopped the day before defendant called 911 to report that Donald was dead.

The prosecutor presented evidence that defendant planned the murder for financial advantage. See *Unger*, 278 Mich App at 223 (motive and opportunity are not elements of the crime, but evidence of these factors is relevant). Defendant had been living in his car before he moved into Donald's home to take care of him. Thomas testified that defendant was obsessed

with developing real estate owned by Donald, but that an attorney advised them that they could do nothing with the properties until Donald's death as Donald suffered from dementia and could not approve the transactions.

The jury also could infer that defendant fabricated a death scenario in order explain the injuries to Donald's neck to the police.[2] Despite that his own medical experts later eliminated this death mechanism, defendant told police that Donald frequently fell in the months before his death, sometimes on purposes, and defendant would catch him by the neck. The jury was entitled to reject this explanation in light of the medical examiner's testimony that Donald's injuries were not consistent with a fall or being picked up by the neck.

The evidence was also sufficient to support a first-degree murder conviction on the theory of felony-murder.

> The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b). [*People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009).]

Among the enumerated felonies to establish felony-murder is "vulnerable adult abuse in the first or second degree under [MCL 750.145n]." MCL 750.145n provides, in relevant part:

> (1) A caregiver is guilty of vulnerable adult abuse in the first degree if the caregiver intentionally causes serious physical harm or serious mental harm to a vulnerable adult.

> * * *

> (2) A caregiver or other person with authority over the vulnerable adult is guilty of vulnerable adult abuse in the second degree if the reckless act or reckless failure to act of the caregiver or other person with authority over the vulnerable adult causes serious physical harm or serious mental harm to a vulnerable adult. . . .

To establish this offense, "the prosecution would have to show that a defendant intentionally caused serious physical harm" or serious mental harm to the vulnerable adult. *People v Comella*, 296 Mich App 643, 650; 823 NW2d 138 (2012). " 'Serious physical harm' means a physical

---

[2] Defendant states in passing that he was not given written *Miranda* warnings, see *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), and the only proof that he was *Mirandized* was from the detective's self-serving testimony. Defendant did not properly present this issue in his statement of questions presented, precluding our review. See *Bouverette v Westinghouse Elec Corp*, 245 Mich App 391, 404; 628 NW2d 86 (2001).

injury that threatens the life of a vulnerable adult, that causes substantial bodily disfigurement, or that seriously impairs the functioning or well-being of the vulnerable adult." MCL 750.145m(r). " 'Serious mental harm' means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner." MCL 750.145m(s).

Defendant and his family members testified that defendant was Donald's sole caregiver. Donald was a vulnerable adult, as evidenced by his dementia and the probate court's appointment of defendant as his guardian. As noted, the evidence was sufficient to enable the jury to find that defendant intended to harm Donald and caused his death by manually strangling him. Manual strangulation causing death clearly falls within the parameters of "caus[ing] serious physical harm" under the vulnerable adult abuse statute. Accordingly, defendant cannot support his challenge to the sufficiency of the evidence.

We affirm defendant's first-degree murder conviction, but remand for correction of defendant's judgment of sentence to show a single conviction of first-degree murder, supported by two different theories, and a single sentence. We do not retain jurisdiction.


/s/ Kathleen Jansen
/s/ Patrick M. Meter
/s/ Elizabeth L. Gleicher